UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ROBIN COOPER, individually and on behalf
of all others similarly situated,

               Plaintiffs,

    v.

PEOPLES BANK,

               Defendant.

Case No. 3:23-cv-00389-GNS

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff, Robin Cooper, individually and on behalf of the classes of persons preliminarily defined below (the "Classes"), makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.    This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant Peoples Bank as successor of Limestone Bank ("Defendant"), arising from Limestone Bank's improper assessment and collection of (1) $35 overdraft fees ("OD Fees") on debit card transactions that were authorized on sufficient funds and (2) $35 on phantom transactions.

2.    Besides being deceptive, these practices breached contract promises made in Limestone Bank's adhesion contracts which include the Overdraft Opt-In Form attached hereto as Exhibit A, the Agreement (Ex. B), and the Fee Schedule (Ex. C, together with Exs. A and B, the "Contract").

3.    Plaintiff and other Limestone Bank customers have been injured by Limestone Bank's practices. Plaintiff, individually and on behalf of the classes of individuals preliminarily defined below, bring claims for breach of contract, including the duty of good faith and fair dealing, unjust enrichment, violations of the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)) and violations of the Kentucky Consumer Protection Act (KRS §§ 367.110 – 367.300) (the "KCPA").

## PARTIES

4.    Plaintiff is an individual and citizen of Kentucky, and a resident of this District, and had a checking account with Limestone Bank at all times material hereto.

5.    Limestone Bank was a Kentucky banking corporation based in Louisville, Jefferson County, Kentucky. In April 2023, Limestone Bank merged into Peoples Bank, was dissolved, and ceased to exist. Peoples Bank thus acquired Limestone Bank's assets and liabilities.[1]

6.    Peoples Bank is a for profit corporation with nearly $7.3 billion in assets. Peoples Bank is headquartered in Marietta, Washington County, Ohio and maintains more than 130 full-service branches throughout Kentucky, Ohio, West Virginia, Virginia, Maryland, and Washington D.C.

## JURISDICTION AND VENUE

7.    Defendant regularly and systematically conducts business and provides retail banking services in this state, including in this District, and provides retail banking services to

---

[1] Pursuant to Limestone Bank and Peoples Bank's merger agreement, "[a]ll rights of creditors and all liens of Limestone Bank shall be preserved unimpaired, and all debts, liabilities and duties of Limestone Bank shall at the Effective Time become obligations of the Surviving Bank and may be enforced against it to the same extent as if such debts, liabilities and duties had been incurred or contracted by it."

customers in this state, including Plaintiff and members of the putative Classes, including in this District. As such, it is subject to the jurisdiction of this Court.

8.      On May 3, 2023, Plaintiff filed her initial class action complaint in the Circuit Court of Jefferson County, Kentucky against Limestone Bank and, on July 6, 2023, Plaintiff filed an amended complaint to reflect that Limestone Bank had been acquired by Peoples Bank.

9.      On July 28, 2023, Defendant removed this case to this District.

10.     Defendant asserts that this Court has jurisdiction over this action over Plaintiff's claims for violations of the Electronic Fund Transfers Act and Regulation E and supplemental jurisdiction over the related state law claims.

11.     Defendant asserts that venue is proper in this District because it is the district and division embracing the place where such action is pending.

## BACKGROUND FACTS

12.     In 2021, the largest financial institutions in America charged customers almost $11 billion in overdraft fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America* (The New York Times, Mar. 9, 2023), https://www.nytimes.com/2023/03/09/magazine/poverty-by-america-matthew-desmond.html.

13.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

14.     In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY*

*Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

15.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.    DEFENDANT ASSESSES OD FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.

16.    Plaintiff brings this action challenging Limestone Bank's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

17.    Limestone Bank's practice was as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Limestone Bank immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts always had sufficient funds available to cover these transactions because Limestone Bank already held the funds for payment.

18.    However, Limestone Bank still assessed crippling OD Fees on many of these transactions and misrepresented its practices in the Contract.

19.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Limestone Bank later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

20.     Limestone Bank maintained a running account balance, tracking funds consumers have for immediate use. This running account balance was adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Limestone Bank held the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds were not available for any other use by the account holder and were specifically reserved for a given debit card transaction.

21.     Indeed, the entire purpose of the immediate debit and hold of positive funds was to ensure that there were enough funds in the account to pay the transaction when it settled:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

22.     That means when any subsequent, intervening transactions were initiated on a checking account, they were compared against an account balance that had already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incurred OD Fees due to the unavailability of the funds held for earlier debit card transactions.

23.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Limestone Bank improperly charged OD Fees on APSN Transactions.

24.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

[A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

25.    The CFPB again criticized the assessment of OD Fees on APSN Transactions in its

October 2022 circular, stating:

Even if a consumer closely monitors their account balances and carefully calibrates their spending in accordance with the balances shown, they can easily incur an overdraft fee they could not reasonably anticipate because financial institutions use processes that are unintelligible for many consumers and that consumers cannot control. . . .

For example, even when the available balance on a consumer's account—that is, the balance that, at the time the consumer initiates the transaction, would be

displayed as available to the consumer—is sufficient to cover a debit card transaction at the time the consumer initiates it, the balance on the account may not be sufficient to cover it at the time the debit settles. The account balance that is not reduced by any holds from pending transactions is often referred to as the ledger balance. The available balance is generally the ledger balance plus any deposits that have not yet cleared but are made available, less any pending (i.e., authorized but not yet settled) debits. Since consumers can easily access their available balance via mobile application, online, at an ATM, or by phone, they reasonably may not expect to incur an overdraft fee on a debit card transaction when their balance showed there were sufficient available funds in the account to pay the transaction at the time they initiated it. Such transactions, which industry commonly calls "authorize positive, settle negative" or APSN transactions, thus can give rise to unanticipated overdraft fees.

. . .

Charging an unanticipated overdraft fee may generally be an unfair act or practice. Overdraft fees inflict a substantial injury on consumers. Such fees can be as high as $36; thus consumers suffer a clear monetary injury when they are charged an unexpected overdraft fee. Depending on the circumstances of the fee, such as when intervening transactions settle against the account or how the financial institution orders the transactions at the end of the banking day, consumers could be assessed more than one such fee, further exacerbating the injury. These overdraft fees are particularly harmful for consumers, as consumers likely cannot reasonably anticipate them and thus plan for them.

*Consumer Financial Protection Circular 2022-06: Unanticipated Overdraft Fee Assessment Practices*, Consumer Financial Protection Bureau 5-6 (Oct. 26, 2022), https://bit.ly/3SNPg69.

26.    There was no justification for this practice, other than to maximize Limestone Bank's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Limestone Bank was free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions— and it did the latter to the tune of millions of dollars each year.

27.    But Limestone Bank was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

28.     Besides being deceptive, this practice breached contract promises made in Limestone Bank's adhesion contracts, which fundamentally misconstrued and misled consumers about the true nature of Limestone Bank's processes and practices. Limestone Bank also exploited its contractual discretion by implementing the practices to gouge its customers.

29.     Federal regulators have repeatedly condemned OD Fees on APSN Transactions where, like here, the financial institution and its customers did not expressly and unambiguously agree to them.

30.     For example, the Consumer Financial Protection Bureau ("CFPB") ordered Regions Bank to pay $141 million to reimburse consumers for OD Fees on debit card transactions authorized on sufficient funds, noting such fees result from "counter-intuitive, complex processes" and finding them to be "unfair" and "abusive" in violation of federal law. Consent Order, *In the Matter of: Regions Bank*, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

31.     In October 2022, the CFPB again declared that the assessment of OD Fees on debit card transactions authorized on sufficient funds may constitute an "unfair act or practice" because consumers cannot reasonably avoid these "unanticipated" OD Fees. *See Circular 2022-06*, *Unanticipated Overdraft Fee Practices*, CONS. FIN. PROTECTION BUREAU (Oct. 26, 2022), https://bit.ly/3VJm3uB.

32.     In December 2022, the CFPB ordered Wells Fargo Bank, N.A. to refund $205 million in such "Authorized-Positive Overdraft Fees" and again declared such practice to be "unfair, deceptive, or abusive" in violation of federal law. Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, No. 2022-CFPB-0011 ¶¶ 47, 60 (Dec. 20, 2022) (Dkt. 1), https://bit.ly/3ZdnwMM. The CFPB reasoned that "[c]onsumers may be taken by surprise when

they incur Authorized-Positive Overdraft Fees because they believed that if they had enough money to cover the relevant transaction when it was authorized they would not incur an Overdraft fee. These Authorized-Positive Overdraft Fees were not reasonable avoidable because they were contrary to consumers' reasonable expectations." *Id.* at ¶ 44.

33.     And in its Winter 2023 Supervisory Highlights, the CFPB again stated this APSN practice is "unfair," as "[c]onsumers could not reasonably avoid the substantial injury, irrespective of account-opening disclosures." *Supervisory Highlights Junk Fees Special Edition*, CONS. FIN. PROTECTION BUREAU 4 (Winter 2023), https://tinyurl.com/3ste5dfr. The CFPB explained that "[w]hile work is ongoing, at this early stage Supervision has already identified at least tens of millions of dollars of consumer injury and in response to these examination findings, institutions are providing redress to over 170,000 consumers" and indicated the CFPB intends to continue pursuing such "legal violations surrounding APSN overdraft fees both generally and in the context of specific public enforcement actions[, which] will result in hundreds of millions of dollars of redress to consumers." *Id.*

34.     The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin: Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, FED. RESERVE BD. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

35.     On April 26, 2023, the Office of the Comptroller of the Currency ("OCC") joined the chorus of regulators, issuing a bulletin to banks addressing the risks associated with overdraft

protection programs. The OCC addressed APSN practices as follows:

> Some banks assess overdraft fees on debit card transactions that authorize when a customer's available balance is positive but that later post to the account when the available balance is negative.
>
> In this scenario, a customer's account has a sufficient available balance to cover a debit card transaction when the transaction is authorized but, due to one or more intervening transactions, has an insufficient available balance to cover the transaction at the time it settles. This is commonly referred to as an APSN transaction. In addition to assessing an overdraft fee on the APSN transaction, some banks also assess an overdraft fee on intervening transactions that exceed the customer's available balance. In this scenario, for example, the bank reduces a customer's available balance by an amount that is more than, equal to, or less than the initial authorized debit card transaction, and subsequently, an intervening transaction further reduces the customer's available balance so that the account no longer has a sufficient available balance. The bank charges an overdraft fee on both the intervening transaction and the initial APSN transaction when posted to the customer's account.
>
> The OCC has reviewed a number of overdraft protection programs that assess overdraft fees on APSN transactions. In some instances, the OCC has found account materials to be deceptive, for purposes of Section 5, with respect to the banks' overdraft fee practices. In these instances, misleading disclosures contributed to findings that the APSN practice was also unfair for purposes of Section 5. In addition, and based on subsequent analysis, even when disclosures described the circumstances under which consumers may incur overdraft fees, the OCC has found that overdraft fees charged for APSN transactions are unfair for purposes of Section 5 because consumers were still unlikely to be able to reasonably avoid injury and the facts met the other factors for establishing unfairness.

*OCC Bulletin 2023-12: Overdraft Protection Programs: Risk Management Practices*, OFFICE OF COMPTROLLER OF THE CURRENCY (Apr. 26, 2023), https://tinyurl.com/mt63pfnb (footnotes omitted).

### A.  Mechanics of a Debit Card Transaction

36.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from the financial institution. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects via an

intermediary to Limestone Bank, which verified that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

37.     At this step, if the transaction was approved, Limestone Bank immediately decremented the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

38.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

39.     Limestone Bank (like all banks and credit unions) decided whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision could only occur at the point of sale, when the transaction was authorized or declined. It was at that point— and only that point—that Limestone Bank could choose to either pay the transaction or to decline it. When the time came to actually transfer funds for the transaction to the merchant, it was too late for the bank to deny payment—the bank had no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

40.     There is no change—no impact whatsoever—to the available funds in an account when transfer step occurs.

### B. Limestone Bank's Contract

41.     Limestone Bank promised in its Opt-In Form that "[a[n] <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A (emphasis in original).

11

42.     The Agreement goes on to state that "[i]f your account lacks sufficient funds available to pay a check, preauthorized transfer or other debit activity presented for payment, we may (1) return the item, or (2) pay item at our discretion." Ex. B at Cooper / Limestone 000004.

43.     In breach of these promise, Limestone Bank assessed OD Fees when there was enough money in the account to cover the transaction. The account did not lack sufficient funds available to pay the item.

44.     Defendant also promises that it will reduce the available balance in the account when a debit card transaction is authorized and place a hold on the funds for the settlement of that transaction:

> **AUTHORIZATION HOLDS:** An authorization hold is a temporary hold that is placed on your account for certain debit card transactions.  The amount of the temporary hold may be more than the actual amount of the transaction, so your available account balance will temporarily be reduced by the amount of the temporary hold.  If the authorization hold or the processing of subsequent transactions causes your account to have non-sufficient funds to pay the transaction, your account may be subject to an Overdraft Fee or subject to our Overdraft practices, and if applicable, any overdraft protection plan.

Ex. B at Cooper / Limestone 000008; *see also id*. at 000007 ("Purchases made with your card…will cause your 'designated account' to be debited for the amount of the purchase.")

45.     Defendant further promised that authorization and payment occurred simultaneously and that overdrafts would be determined when Limestone Bank "authorize[d] and pa[id]" the debit card transaction:

> We do ***authorize and pay*** overdrafts for the following types of transactions:
> - Checks and other transactions made using your checking account number
>
> We do not ***authorize and pay*** overdrafts for the following types of transactions unless you ask us to (see below):
> - ATM transactions
> - Everyday debit card transactions
>
> We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction.
>
> If we do not ***authorize and pay*** an overdraft, your transaction will be declined.
>
> . . .

WHAT IF I WANT LIMESTONE BANK TO ***AUTHORIZE AND PAY*** OVERDRAFTS ON MY ATM AND EVERYDAY DEBIT CARD TRANSACTIONS?

If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions, complete the form below…

___ I do not want Limestone Bank to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

___ I want [Defendant] to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

Ex. A (emphasis added).

46.     This language linking payment to authorization reasonably means that transactions were paid, and therefore overdrafts were determined, at authorization.

47.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Limestone Bank assessed OD Fees on them anyway.

48.     The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

49.     In fact, Limestone Bank actually authorized transactions on positive funds, set those funds aside on hold, then failed to use those same funds to post those same transactions. Instead, it used a secret posting process described below.

50.     All of the above representations and contractual promises are untrue. Limestone Bank charged OD Fees even when sufficient funds existed to cover transactions that were authorized into a positive balance. No express language in any document permitted Limestone Bank to impose fees on APSN Transactions.

51.     The Contract also misconstrued Limestone Bank's true debit card processing and overdraft practices.

52.     First, and most fundamentally, Limestone Bank charged OD Fees on debit card transactions for which there were sufficient funds available to cover throughout their lifecycle.

53.     Limestone Bank's practice of charging OD Fees even when sufficient available funds existed to cover a transaction violated its contractual promise not to do so. This discrepancy between Limestone Bank's actual practice and the Contract caused consumers like Plaintiff to incur more OD Fees than they should.

54.     Next, sufficient funds for APSN Transactions were actually debited from the account immediately, consistent with standard industry practice.

55.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant did when it re-debited the account during a secret batch posting process.

56.     Defendant's actual practice was to assay the same debit card transaction twice to determine if it overdrew an account—both at the time of authorization and later at the time of settlement.

57.     At settlement, however, an available balance did not change at all for transactions previously authorized into positive funds. As such, Limestone Bank could not then charge an OD Fee on the transactions because the available balance had not been rendered insufficient due to the pseudo-event of settlement.

58.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Limestone Bank released the hold placed on funds for

the transaction for a split second, putting money back into the account, then re-debited the same transaction a second time.

59.    This secret step allowed Limestone Bank to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

60.    In sum, there was a huge gap between Limestone Bank's practices as described in the Contract and Limestone Bank's actual practices.

61.    Other banks and credit unions that employ this abusive practice require their accountholders to expressly agree to it—something Limestone Bank here never did.

62.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

63.    Limestone Bank and its accountholders made no such agreement. The Contract thus misled and deceived account holders.

### C.    Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

64.    Limestone Bank's assessment of OD Fees on transactions that did not overdraw an account was inconsistent with the immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

65.    Limestone Bank was aware that this is precisely how its accountholders reasonably understand debit card transactions work.

15

66.     Limestone Bank knew that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

67.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

68.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

69.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

70.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca

Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

71.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

72.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

73.    Ultimately, unclear and misleading fee representations like those in Limestone Bank's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

74.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

75.     Despite this recommendation, Limestone Bank continued to assess OD Fees on transactions that are authorized on sufficient funds.

76.     Limestone Bank was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time the transactions were actually initiated and the funds were removed from the customer's available balance—and the Contract only supported this perception.

77.     Limestone Bank was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its customers agree to these practices.

### D. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds

78.     On January 18, 2022, May 6, 2022 and September 19, 2022, Plaintiff was assessed OD Fees on transactions previously authorized on sufficient funds.

79.     Because Limestone Bank had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to "cover" the transactions and should not have been assessed these fees.

80.     The improper fees charged by Limestone Bank were also not errors by Limestone Bank, but rather were intentional charges made by Limestone Bank as part of its standard processing of transactions.

81.    Plaintiff therefore had no duty to report the fees as errors because they were not errors but were part of the systematic and intentional assessment of fees according to Limestone Bank's standard practices.

82.    Moreover, any such reporting would have been futile as Limestone Bank intentionally structured its fee practice in this manner.

## II.    DEFENDANT CHARGES OVERDRAFT FEES ON THIRD-PARTY MERCHANT ACCOUNT VERIFICATIONS THAT ARE NOT "TRANSACTIONS"

### A.  Overview of the Claim

83.    Plaintiff brings this action challenging Defendant's practice of charging fees on phantom transactions—where accountholders never perform a debit or transaction, and where the account balance is never actually overdrawn.

84.    Several apps and websites use a verification process to confirm the validity of a user's bank account so that the user can then seamlessly send and receive payments.

85.    As part of the process of verifying a user's bank account, these entities will deposit and immediately withdraw a tiny amount, sometimes a single penny. This deposit and withdrawal process occurs virtually simultaneously and is designed solely to ensure the account is valid and the entity can communicate with the account.

86.    No actual purchase or payment is involved in what is essentially a "test" transaction, and there is no change to the account balance.

87.    The bank account linking and verification process is instantaneous. Yet Defendant split this instantaneous process in order to increase fees it could charge on accounts.

88.    A bank like Defendant is notified and aware of this routine practice, just as it is aware and notified that an accountholder has made no purchase, debit, or transaction when third parties verify a consumer's account with this method.

19

**B.  The Contract**

89.     Limestone Bank promises that "[a[n] <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A (emphasis in original).

90.     No "overdraft occurs" on a merchant's attempt to verify the validity of a consumer's account particularly because the micro-deposit required to complete the verification process is placed in the account before it is deducted; therefore, the account is never overdrawn.

91.     Defendant breached its contractual promises when it charged fees in these circumstances.

**C.  Plaintiff Was Assessed an Overdraft Fee On a Third-Party Merchant's Verification of the Validity of His Checking Account**

92.     On December 5, 2022, Credit One Bank put this verification process into motion with the sole and exclusive intent of verifying that Plaintiff's account was valid and active. To do this, it $1.34 into Plaintiff's checking account and then immediately removed it. No purchase or transaction was made by Plaintiff, and no change to her account balance occurred.

93.     Nonetheless, Defendant charged Plaintiff a $35 fee anyway.

94.     This fee assessment violated the Contract.

95.     The improper fee charged by Defendant was not an error, but rather an intentional charge made by Defendant as part of its standard processing of items.

96.     Plaintiff therefore had no duty to report this fee as an error.

97.     Moreover, any such reporting would have been futile as Defendant had decided to charge fees in this specific manner to maximize profits at the expense of customers

## CLASS ALLEGATIONS

98.    Plaintiff brings this action individually and as a class action on behalf of the following proposed Classes:

> APSN Class: All citizens who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

> Verify Bank Class: All citizens and customers of Defendant who, during the applicable statute of limitations, were charged a fee as a result of a verification process on their account that resulted in no change to their account balances.

Plaintiff reserves the right to modify or amend the definition of the Classes as this litigation proceeds.

99.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

100.    The time period for the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

101.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

102.    The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was charged improper fees as set forth herein. The representative Plaintiff, like all members of the Classes, has been damaged by

Limestone Bank's misconduct. Furthermore, the factual basis of Limestone Bank's misconduct is common to all members of the Classes and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

103.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

104.    Among the questions of law and fact common to the Classes include:

    a.    Whether Limestone Bank charged OD Fees on APSN Transactions;

    b.    Whether Limestone Bank charged OD Fees on phantom transactions;

    c.    Whether these fee practices breached the Contract and Limestone Bank's duty of good faith and fair dealing;

    d.    Whether Limestone Bank was unjustly enriched by this practice;

    e.    Whether Limestone Bank violated Regulation E and the KCPA;

    f.    The proper method or methods by which to measure damages; and

    g.    The declaratory and injunctive relief to which the Classes are entitled.

105.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

106.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress

individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Limestone Bank's misconduct will proceed without remedy.

107.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including Breach of the Duty of Good Faith and Fair Dealing**
*(On Behalf of Plaintiff and the APSN Class)*

108.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

109.    Plaintiff and Limestone Bank contracted for banking services, as embodied in Limestone Bank's account documents. *See* Exs. A-C.

110.    All contracts entered by Plaintiff and the Classes are identical or substantively identical because Limestone Bank's form contracts were used uniformly.

111.    Limestone Bank has breached the express terms of its own agreements as described herein.

112.    Kentucky imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account

holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

113.    Limestone Bank abused its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging OD Fees on APSN Transactions.  This is an abuse of the power that Limestone Bank had over Plaintiff and her bank account, was contrary to Plaintiff's reasonable expectations under the Contract, and breached Limestone Bank's implied covenant to engage in fair dealing and to act in good faith.

114.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

115.    Limestone Bank breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

116.    Limestone Bank harmed Plaintiff and members of the Classes by abusing its contractual discretion that no reasonable customer would anticipate.

117.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Contract.

118.    Plaintiff and members of the Classes have sustained damages because of Limestone Bank's breach of the Contract.

119.    Plaintiff and members of the Classes have sustained damages because of Limestone Bank's breach of the covenant of good faith and fair dealing.

### SECOND CLAIM FOR RELIEF
**Breach of Contract, Including Breach of the Duty of Good Faith and Fair Dealing**
*(On Behalf of Plaintiff and the Verify Bank Class)*

120.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

121.    Plaintiff and Limestone Bank contracted for banking services, as embodied in Limestone Bank's account documents. *See* Exs. A-C.

122.    All contracts entered by Plaintiff and the Verify Bank Class are identical or substantively identical because Limestone Bank's form contracts were used uniformly.

123.    Limestone Bank has breached the express terms of its own agreements as described herein.

124.    Kentucky imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

125.    Limestone Bank abused its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging OD Fees on phantom transactions. This is an abuse of the power that Limestone Bank had over Plaintiff and her bank account, was contrary to Plaintiff's reasonable expectations under the Contract, and breached Limestone Bank's implied covenant to engage in fair dealing and to act in good faith.

126.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and

abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

127.    Limestone Bank breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

128.    Limestone Bank harmed Plaintiff and members of the Verify Bank Class by abusing its contractual discretion that no reasonable customer would anticipate.

129.    Plaintiff and members of the Verify Bank Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

130.    Plaintiff and members of the Verify Bank Class have sustained damages because of Limestone Bank's breach of the Contract.

131.    Plaintiff and members of the Verify Bank Class have sustained damages because of Limestone Bank's breach of the covenant of good faith and fair dealing.

**THIRD CLAIM FOR RELIEF**
**Violation of Electronic Fund Transfers Act (Regulation E)**
**C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq*.))**
**(On Behalf of Plaintiff and the APSN Class)**

132.    Plaintiff incorporates by reference the preceding paragraphs.

133.    By charging OD Fees on APSN Transactions, Limestone Bank violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

134.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E. 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the

consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. *Id*.

135.    The notice required by Regulation E "shall be clear and readily understandable." 12 C.F.R. §205.4(a)(l).

136.    To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.

137.    The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

138.    As stated in the Official Staff Commentary, the intent and purpose of Regulation E's Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way." 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948.

139.    Limestone Bank failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Limestone Bank's opt-in method failed to satisfy 12 C.F.R. § 1005.17 because its overdraft notice misrepresented Limestone Bank's true overdraft practices, as discussed above.

140.    As a result of violating Regulation E's prohibition against assessing OD Fees without obtaining affirmative consent to do so, Limestone Bank harmed Plaintiff and the APSN Class.

141.    Because of Limestone Bank's violation of Regulation E, 12 C.F.R. § 1005.17, Plaintiff and members of the APSN Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Classes)**

142.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

143.    Plaintiff and members of the Class conferred a benefit on Limestone Bank at the expense of Plaintiff and members of the Class when they paid improper OD Fees.

144.    There was an appreciation of this benefit by Limestone Bank in the form of the substantial revenue that Limestone Bank generated from the imposition of such fees.

145.    Limestone Bank inequitably accepted such improper fees without payment to Plaintiff and members of the Class for their value.

146.    Limestone Bank should not be allowed to profit or enrich itself inequitably at Plaintiff and the Class's expense and should be required to make restitution to Plaintiff and the Class.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Kentucky Consumer Protection Act (KRS §§ 367.110 – 367.300)**
**(On Behalf of Plaintiff and the Class)**

147.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

148.    The Commonwealth of Kentucky believes that "the public health, welfare and interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services." KRS § 367.120(1).

149.    In furtherance of this public policy objective, the Kentucky Consumer Protection Act (the "KCPA") was enacted in order to prevent "unfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce." KRS § 367.170(1).

150.    Limestone Bank engaged in trade or commerce as defined in the KCPA because it offered its bank account deposit, checking, and debit card services to the people of Kentucky, including Plaintiff and members of the Class.

151.    Plaintiff has standing to bring this action under KRS § 367.220 because she entered into a contract with Limestone Bank for the purchase of its bank account deposit, checking and debit card services primarily for personal, family or household purposes.

152.    "Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" are unlawful pursuant to the KCPA. KRS § 367.170(1).

153.    Limestone Bank engaged in unfair, false, misleading, or deceptive acts or practices or otherwise violated KCPA by, among other things, knowingly and intentionally employing a policy and practice of charging improper fees.

154.    Limestone Bank's conduct caused Plaintiff and the members of the Class to suffer ascertainable losses in the form of improper fees that, but for Limestone Bank's unfair, false, misleading, or deceptive practices and policies described herein, would not have otherwise been imposed.

155.    Plaintiff and Class members are entitled to damages, declaratory relief, injunctive relief, and attorneys' fees and costs. KRS § 367.220.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.    Certification for this matter to proceed as a class action;

b.    Declaratory and injunctive relief to the extent Defendant is in breach of its contract;

c.    Designation of Plaintiff as the Class Representative and designation of the undersigned as Class Counsel;

d.    Restitution of all improper fees paid to Limestone Bank by Plaintiff and the Classes because of the wrongs alleged herein in an amount to be determined at trial;

e.    Actual damages in amount according to proof;

f.    Pre- and post-judgment interest at the maximum rate permitted by applicable law;

g.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

h.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.


Dated: 12/13/2023

By: */s/ Andrew E. Mize*
Andrew E. Mize (Ky. Bar No. 94453)
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
615-254-8801
amize@stranchlaw.com

J. Gerard Stranch, IV, *pro hac vice*
Martin F. Schubert, *pro hac vice*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
615-254-8801
gstranch@stranchlaw.com
mschubert@stranchlaw.com

Lynn A. Toops, *pro hac vice*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com

Christopher D. Jennings, *pro hac vice*
THE JOHNSON FIRM
610 President Clinton Ave, Suite 300
Little Rock, AR 72201
(501) 372-1300
chris@yourattorney.com

*Attorneys for Plaintiff and the Putative Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of December 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all parties of record.

/s/ Andrew E. Mize
Andrew E. Mize